Electronically Filed
Intermediate Court of Appeals
CAAP-13-0003694
27-FEB-2018
09:04 AM

NO. CAAP-13-0003694

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

ROYNES JOSEPH DURAL, II, Petitioner-Appellant,
v.
STATE OF HAWAI'I, Respondent-Appellee.

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(S.P.P. No. 09-1-0015 (CR. NO. 02-1-2791)

MEMORANDUM OPINION
(By: Nakamura, Chief Judge, and Leonard and Chan, JJ.)

Petitioner-Appellant Roynes Joseph Dural, II (Dural) appeals from the order denying his second petition for post-conviction relief. Dural was convicted in 2003 of five counts of sexual assault of a minor who was less than fourteen years old -- one count of first-degree sexual assault and four counts of third-degree sexual assault. The complaining witness (CW) was twelve and thirteen years old at the time of the charged offenses.

Dural was the CW's uncle by marriage. In 1996, Dural married the sister of the CW's stepfather. In 1996 and in 1998, Dural and his wife lived with the CW's family, which consisted of the CW's mother, the CW's stepfather, and the CW's older brother and younger sister. Dural became close to the CW's family and spent a lot of time with the children, taking them to the beach and other outings. Dural also became close friends with the CW's

stepfather and with the CW's biological father. Dural separated from his wife and moved from the CW's home in 1998, but would frequently visit the CW's home, often spending the night. In 1999, while the CW's mother and her stepfather were having marital difficulties, the CW's mother and the children stayed with Dural at Dural's apartment. During this time, Dural and the CW's mother became involved in a romantic sexual relationship. This relationship ended in early 2000.

In July 2001, when the CW was fourteen years old, the . CW disclosed to her mother that Dural had been engaging in sexual intercourse with her. The CW reported that the sexual intercourse began in 1998, when she was twelve years old, and had been ongoing since that time. The CW said that during this time, Dural had engaged in sexual intercourse with her more than twenty times at various locations. The CW's mother immediately reported the CW's disclosures to the police. In December 2002, Respondent-Appellee State of Hawai'i (State) charged Dural by indictment with five counts of sexual assault. After a jury trial, Dural was found guilty as charged on all counts. His Judgment of Conviction (Judgment) was entered on November 3, 2003.

Dural filed a direct appeal of his convictions. This court issued a summary disposition order which affirmed Dural's convictions, and the supreme court denied Dural's application for writ of certiorari. State v. Dural, No. 26265, 2005 WL 1538971 (June 29, 2005). On July 31, 2006, Dural filed his first petition for post-conviction relief pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 40 (2006) (First Rule 40 Petition), which the Circuit Court of the First Circuit (Circuit Court) denied. On appeal, this court affirmed the Circuit Court's order denying Dural's First Rule 40 Petition. Dural v. State, No. 28533, 2008 WL 4195893 (Sept. 15, 2008). The supreme court denied Dural's application for writ of certiorari, but without prejudice to his filing another HRPP Rule 40 petition based on alleged newly discovered evidence that had been presented for the

first time in the appeal.  <u>Dural v. State</u>, No. 28533, 2009 WL 2051423 (Jan. 27, 2009).

Dural subsequently filed his second petition for post-conviction relief pursuant to HRRP Rule 40 (Second Rule 40 Petition).  While the Second Rule 40 Petition was pending in the Circuit Court, Dural was granted parole by the Hawai'i Paroling Authority on December 1, 2011.  Dural's Second Rule 40 Petition was based on alleged newly discovered evidence that the CW was involved in a sexual relationship with C.K. during or near the period of time that Dural was charged with sexually assaulting the CW.  C.K. was more than ten years older than the CW.  The CW married C.K. a month after Dural's trial was completed.  It was Dural's theory that the CW had falsely accused him of sexual assault to cover up or conceal her sexual relationship with C.K.

After holding evidentiary hearings, the Circuit Court denied Dural's Second Rule 40 Petition.  The Circuit Court found among other things that "[the CW] was not having sexual relations with [C.K.] before or during the time period stated in the indictment" for Dural's charged sexual assaults.  The Circuit Court also concluded that Dural's asserted newly discovered evidence would not probably change the result in a later trial.

On appeal, Dural contends that the Circuit Court[1] erred in: (1) denying his request for a new trial; and (2) denying his request to reopen the proceedings to consider additional evidence.  As explained below, we conclude that Dural presented newly discovered evidence that warranted a new trial and that the Circuit Court abused its discretion in denying his request for a new trial.  We therefore vacate the Circuit Court's order denying Dural's Second Rule 40 Petition and remand the case for further proceedings.

---

[1] The Honorable Karen S.S. Ahn presided over Dural's trial and his Second Rule 40 Petition.  The Honorable Richard W. Pollack presided over Dural's First Rule 40 Petition.

BACKGROUND

The CW was born in late November 1986. The indictment charged Dural with sexually assaulting the CW between late November 1998 and late November 2000, when the CW was 12 and 13 years old. Dural was born in August 1974, and thus he was twenty four to twenty six years old at the time of the charged offenses. At the time of the alleged sexual assaults, the age of consent in Hawai'i was fourteen years old, and thus consensual sexual activity with someone fourteen years or older was not a crime. See Hawaii Revised Statutes (HRS) §§ 707-730, 707-732 (1993).[2]

Dural was charged in the indictment with first-degree sexual assault for subjecting the CW to sexual penetration by inserting his penis into her vaginal opening (Count 1). He was also charged with third-degree sexual assault for subjecting the CW to sexual contact or causing her to have sexual contact by placing his hand on her breast (Count 2), placing his hand on her genitals (Count 3), placing his mouth on her breast (Count 4), and causing her to place her hand on his penis (Count 5).

I.

At Dural's trial, the CW's mother (Mother) testified that at the end of December 1999, Mother and her children moved into Dural's apartment while she was experiencing marital difficulties. While Mother was living with Dural, the two became involved in a romantic and sexual relationship. Mother's relationship with Dural ended in early 2000, and she told Dural to stay away from her family. Dural, however, continued to see the CW and her siblings through their visits with their biological father (Father), who lived with Dural for a period of time and was close friends with Dural.

According to Mother, she learned on July 13, 2001, that the CW had been sexually assaulted by Dural. Prior to the CW's disclosure, the CW had been asking Mother about sex and

---

[2] Effective July 10, 2001, the age of consent for sexual activity in Hawai'i was raised from fourteen years old to sixteen years old. See infra note 7.

4

pregnancy. Mother saw that the CW "was troubled" and asked the CW whether something was bothering her. The CW eventually told Mother that the CW was not a virgin. The CW was crying when she said this. Mother asked the CW who it was, and Mother named several people, but the CW did not respond with a name. Mother asked the CW if the person was an adult, and the CW said yes. Mother then asked if the person was Dural, and the CW responded "yes[.]" The next day, Mother reported the CW's disclosure to the police. Mother accompanied the CW to interviews with police detectives and to a physical examination by a doctor. Mother never personally saw Dural having sex with or fondling the CW.

The CW's stepfather (Stepfather) testified that Dural was his former brother-in-law, having previously been married to Stepfather's sister. According to Stepfather, after Dural separated from Stepfather's sister in 1999, Dural would come over and sleep at Stepfather's house. Stepfather would come out of his room late at night and see Dural and the CW "sleeping together in a cuddled position" "head by head, arms wrapped around each other" on the living room couch. Stepfather saw Dural laying on the couch with the CW in this position about five times, and it made Stepfather "feel kinda uneasy because [he] didn't think that was proper[.]" Stepfather and Dural were "real close," and Stepfather considered Dural to be one of his best friends.

The CW's older brother (Brother) testified that Dural treated Brother and his sisters "good," taking them to the beach and the arcade, and they liked "hanging out" with Dural. Brother stated that he saw Dural and the CW more than once "cuddled together" on the couch. He also stated that Dural and the CW would leave together alone on store or food runs and take "longer than necessary" to come back.

The CW testified that her sexual relationship with Dural began when she was twelve. According to the CW, she had sexual intercourse with Dural more than twenty times while she was twelve and thirteen years old. Dural had sex with the CW in

various places in the CW's home, in the bathroom and bedroom at Dural's apartment, and in his car at night at Blaisdell Park while they were out buying food. The CW testified that her sexual encounters with Dural were "consensual," that Dural said that he loved her, and that she wanted to have sex with him. During their sexual encounters, Dural also touched her breast with his hands and mouth and touched her genitals with his hand, and she touched his penis with her hand. The CW testified that the last time she had sex with Dural was about the end of June or beginning of July 2001, when she was fourteen years old. This was right before she disclosed her sexual relationship with Dural to Mother.

With respect to her disclosure to Mother, the CW testified that she had asked Mother questions about sex and pregnancy. According to the CW, Mother then asked whether the CW was having sex, and the CW said no. The CW felt bad about lying to Mother and eventually told Mother that she was no longer a virgin. Mother asked who the CW had sex with, first listing names of boys the CW's age. Mother then asked whether it was an adult, and the CW said yes. Mother asked whether it was Dural, and the CW responded "Yeah."

Dural testified in his own defense at trial. Dural denied that he had engaged in any sexual intercourse or sexual contact with the CW. Dural's theory of defense was that Mother was upset that he had ended their relationship, and that Mother had induced the CW to make false accusations against him.

The jury found Dural guilty as charged on all counts. The Circuit Court sentenced Dural to twenty years of incarceration on Count 1 and five years of incarceration on each of Counts 2 through 5, with all terms to run concurrently. On November 3, 2003, the Circuit Court entered its Judgment.

II.

Dural filed a direct appeal from his Judgment. On appeal, Dural argued that: (1) evidence of Mother's attempted suicide when she and Dural ended their relationship was

6

improperly excluded because it showed bias against Dural; (2) evidence of prior allegations by Mother that Dural had sexually assaulted Mother and that Dural's ex-wife had sexually assaulted Mother's son were improperly excluded because the evidence showed Mother's untruthfulness and Mother's bias against Dural; and (3) the prosecutor had engaged in misconduct in cross-examining Dural and in closing argument. This court affirmed the Circuit Court's Judgment by summary disposition order filed on June 29, 2005, and the supreme court denied Dural's application for writ of certiorari on August 8, 2005.

III.

On July 31, 2006, Dural filed his First Rule 40 Petition. Among the other arguments, Dural asserted that:

> The trial court allowed the prosecution to make representations that [the CW] was a virgin, and that I was the person having sex with her, and did not allow me to establish my innocence by showing that the person involved with [the CW] was actually her stepfather's best friend, and to show the personal reasons [the CW] and her mother had to blame me instead.

In his supporting memorandum, Dural asserted that he had "[n]ewly discovered evidence" that the CW had actually been involved with a man named C.K., and that in exchange for accusing Dural in C.K.'s place, the CW was "rewarded with new bedroom furniture" and given parental consent to marry C.K. shortly after Dural's conviction.

The Circuit Court denied Dural's First Rule 40 Petition. As to Dural's arguments about the evidence of the CW's relationship with C.K., the Circuit Court found that this evidence did not meet the legal standard to prevail on a motion for new trial based on newly discovered evidence because, even assuming it qualified as newly discovered evidence, it was offered solely for impeachment purposes. Dural appealed the Circuit Court's order denying his First Rule 40 Petition. This court issued a summary disposition order affirming the Circuit Court. We concluded that the Circuit Court did not err in finding that Dural's proffered evidence concerning C.K. failed to

7

meet the standard established for a new trial based on newly discovered evidence. <u>Dural v. State</u>, No. 28533, 2008 WL 4195893 at *6 (Hawai'i App. Sept. 15, 2008) (SDO). During his appeal, Dural referred to statements appearing on the CW's website that had not been presented to the Circuit Court. We declined to consider this evidence in deciding Dural's appeal. <u>Id.</u>

Dural applied for a writ of certiorari from this court's decision with the Hawai'i Supreme Court. On January 27, 2009, the supreme court denied the application for certiorari, but without prejudice to Dural "filing another Rule 40 petition in the circuit court based on alleged website statements of [the CW] and the declarations of [C.K.] and [Mother], referred to in the Application [for certiorari]."

IV.

A.

On May 1, 2009, Dural filed his Second Rule 40 Petition. Dural was represented by attorneys through the Hawai'i Innocence Project. In this petition, Dural alleged that C.K., and not Dural, had actually been involved in a sexual relationship with the CW; the accusations against Dural had been fabricated in order to protect this relationship; subsequent statements by Mother, Stepfather, and C.K. himself supported these claims; Dural's rights had been prejudiced by his inability to present this evidence at trial; and therefore a new trial was necessary. In support of his Second Rule 40 Petition, Dural submitted copies of postings on the CW's MySpace page; evidence regarding the CW's marriage to and divorce from C.K.; reports prepared by a polygraph examiner regarding examinations conducted with Dural and the CW; and Declarations from Mother, Stepfather, and C.K.

The evidence concerning the CW's MySpace page consisted of a series of messages between the CW and another user that were exchanged between December 2006 and December 2008. During an exchange on December 11, 2006, the CW mentioned that she was going through a divorce with someone she had been together with

8

for six years. When the other user asked the CW whether the person she was divorcing had taken her virginity, the CW responded "no he wuz not my first unfortunately[.]" The CW also stated that when she was with her husband, she was only with him and not other people.

Dural submitted reports of polygraph examinations that were administered to Dural on February 9, 2009, and to the CW on April 29, 2009, at the request of Dural's attorneys. The polygraph examiner opined that the results of Dural's examination indicated that Dural was telling the truth when he answered "No" to the questions: "Did you ever touch [the CW] for sexual purposes?" and "Did you ever touch [the CW] sexually." The polygraph examiner also opined that the results of the CW's examination indicated that the CW was not telling the truth when she answered "Yes" to the questions: "Did you ever have sexual intercourse with Dural?" and "Did you have sexual intercourse with Dural before your 15th birthday?" The Circuit Court subsequently ruled that the polygraph evidence was inadmissible and did not consider such evidence in ruling on the Second Rule 40 Petition.

With respect to the Declarations of Mother, Stepfather, and C.K., significant disputes arose regarding the circumstances under which the declarations had been obtained by representatives of the Innocence Project, the declarant's intent in signing the declaration, and the accuracy of the declarations. These disputes were addressed during the evidentiary hearings held by the Circuit Court on the Second Rule 40 Petition. Although the CW did not sign a declaration, the CW told the police that she met with representatives of the Innocence Project and D.D., Dural's ex-wife and Stepfather's sister, who the CW thought wanted to remarry Dural. The CW stated that she was handed a pre-typed declaration, which stated that she never had sex with Dural and that Mother had forced her to bring charges against Dural. The CW refused to sign the declaration and maintained that her allegations against Dural were true. When she refused

to sign the declaration, the CW stated that the Innocence Project representatives tried to get her to sign by telling her others would be going against her if she refused. The CW also stated that she took the polygraph examination twice because she was told that the first time she took it, the results were inconclusive. She did not know what the results of the second test were.

B.

The Circuit Court held a series of evidentiary hearings on Dural's Second Rule 40 Petition. Based on the testimony presented, the following evidence was largely undisputed. On July 13, 2001, the CW told Mother that Dural had been engaging in sexual intercourse with the CW, starting when the CW was twelve. A year later, in July or August 2002, Mother and Stepfather returned home late at night and saw the CW and C.K. together in the living room. The CW was naked and C.K. was only wearing shorts. C.K. was a good friend of Stepfather, and he told Stepfather he wanted to marry the CW. C.K. and the CW were married in mid-September 2003, a little over a month after the jury had found Dural guilty. The CW was required to and did obtain Mother's permission to marry C.K. because the CW was two months short of seventeen when she got married. C.K. was twenty-nine years old when he married the CW. C.K. and the CW were divorced in 2007. C.K. was not called as a witness at Dural's trial, and he was not specifically mentioned at trial.

Although the existence of a sexual relationship between the CW and C.K. as of August 2002 was undisputed, when the CW's sexual relationship with C.K. began and whether the CW had been in a sexual relationship with C.K. prior to July 13, 2001, when the CW told Mother that Dural and the CW had been engaging in sexual intercourse, was significantly contested.

1.

C.K. testified at a hearing on Dural's Second Rule 40 Petition. C.K. testified that he first kissed and began dating

the CW on December 31, 2000, and they first had sex in August 2001. C.K. denied that their romantic relationship preceded December 31, 2000. C.K. remembered the date of their first kiss because it occurred at a housewarming party for one of his neighbors. The neighbor's prior residence had burned down and members of their church, including the CW's family, had volunteered to renovate a house next to C.K.'s house so the neighbor could move in. C.K. first kissed the CW, which is when they began dating, after the renovations were completed at a housewarming party when the neighbor moved in. C.K.'s residence and the neighbor's residence were owned by the same landlord. C.K. confirmed the date of his first kiss by calling the landlord and finding out when the neighbor had moved into the renovated residence.

C.K. acknowledged that in August of 2002, Stepfather and Mother had discovered the CW, with no clothes on, and him together. Shortly after this incident, C.K. told Stepfather that his sexual relationship with the CW had been going on for about a year. The incident was reported to C.K.'s church, which resulted in his being disfellowshipped on August 15, 2002. He was reinstated to the Church in 2003. He subsequently married the CW in mid-September 2003, and they were divorced in 2007.

C.K. also testified about the circumstances under which he signed the declaration, which Dural submitted in support of his Second Rule 40 Petition. C.K.'s declaration was signed and dated November 12, 2008, contained a portion that had been crossed out, and provided in relevant part as follows:

> 2. I am the person who had a consensual sexual relationship with [the CW], the complaining witness in Cr. No. 02-1-2791, from November 1998 to November 27, 2000, which is the time period in which Roynes Dural is alleged to have committed the sexual assaults.
>
> 3. For my sexual relationship with [the CW], I was disfellowshipped from my congregation.
>
> 4. After making the necessary amends, I was reinstated into the congregation.

11

> 5.  On September 18, 2003, shortly after Roynes Dural's conviction, [the CW] and I married.
>
> I, [C.K.] declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

(Strikeout in original.)  C.K. initialed next to the text "from November 1998 to November 27, 2000" that he had crossed out.

According to C.K., he was contacted by Edward Hu (Hu) in December 2006 or January 2007 and the two met in C.K.'s home. Hu identified himself as a law student investigating Dural's case.  Hu told C.K. that he believed that C.K., and not Dural, had sex with the CW.  C.K. denied that this was the case.  The first meeting with Hu lasted ten to fifteen minutes.

C.K. met with Hu again on November 12, 2008.  This time, Hu was accompanied by Virginia Hench (Hench), a law professor with the Innocence Project, and D.D., Dural's ex-wife. C.K. testified that Hu told him that the CW was now stating that C.K., and not Dural, was the person that the CW had a sexual relationship with during the period charged in the indictment. (There is no indication in the record that the CW had made such a statement).  Hu also told C.K. that Mother had recanted her testimony and implicated him.  After being informed that Mother and the CW had changed their statements and implicated him, C.K. was provided with a pre-written declaration.

C.K. testified that after reviewing the declaration, he knew that the dates in Paragraph 2 were wrong.  This paragraph stated: "I am the person who had a consensual sexual relationship with [the CW], the complaining witness in Cr. No. 02-1-2791, from November 1998 to November 27, 2000, which is the time period in which Roynes Dural is alleged to have committed the sexual assaults."  C.K. testified that he left the room and confirmed the correct dates by calling his landlord.  He knew that he had first kissed the CW at a New Year's Eve party celebrating the completion of his neighbor's renovated home.  He talked to the landlord and confirmed that the party was held on December 31, 2000.  C.K. testified that he informed Hu that the dates in the declaration were incorrect and that he had the correct dates, to

12

which Hu responded that "the dates wasn't important, it didn't matter." Accordingly, C.K. did not write in the correct dates on the declaration. C.K. testified that Hu told him not to worry about criminal liability for his conduct because the applicable statute of limitations had already run out. C.K. responded that he was not worried about being prosecuted but "was concerned about the truth, because [he] wasn't with her at these dates."

C.K. crossed out the dates, "from November 1998 to November 27, 2000" in Paragraph 2, but left the remainder of the statement intact. C.K. testified that he did not cross out the statement "which is the time period in which Roynes Dural is alleged to have committed the sexual assault" because he believed by crossing out the specific dates, he had invalidated the remainder of Paragraph 2. Despite having reservations about signing the declaration, C.K. ultimately signed the declaration. C.K. stated that during the meeting with Hu, Hench, and D.D., he told them many times that he did not want to sign the declaration. However, Hu pressured C.K. into signing the declaration by telling him that if he did not sign, they would subpoena his church's congregation and the elders in his congregation and would bring the matter "into the media . . . so it would be exposed."

Judy Kagawa (Kagawa), the real estate broker for the residences of C.K. and his neighbor, corroborated aspects of C.K.'s testimony. Kagawa testified that she recalls receiving a phone call from C.K. regarding the renovations that had been done to his neighbor's house and when the neighbor had moved in. Kagawa stated that the neighbor's prior residence had burned down, and members of the neighbor's congregation had approached the landlord and volunteered to perform the labor if the landlord would purchase the materials to renovate the residence so the neighbor could move in. Kagawa stated that the landlord agreed, the renovations were made in November and December 2000, and the neighbor moved in on January 1, 2001. During her phone call with

C.K., Kagawa provided him the information about when the neighbor had moved in.

2.

Hu testified that when he first contacted C.K., Hu was a law student representing the Innocence Project. When Hu visited C.K. the second time on November 12, 2008, with Hench and D.D., Hu was in a post-graduate fellowship with the Innocence Project. For the second meeting, Hu brought a declaration he had typed for C.K. According to Hu, during his first visit with C.K., he had told C.K. that even if C.K. had engaged in sexual intercourse with the CW during the period alleged in the indictment, C.K. could not be prosecuted because the statute of limitations had run. Hu was worried that this information was incorrect, and he asked Hench to explain to C.K. that the statute of limitations had not run. Hench did so at the beginning of the interview. Despite this explanation, C.K. said he would sign the declaration.

However, before signing, C.K. said he was unsure about the dates in Paragraph 2. C.K. left the room for what seemed like a long time. When he came back, C.K. said that his relationship with the CW had begun on December 31, 2000, which was after the CW turned fourteen.

Hu said he told C.K. that C.K. could cross out the dates. Hu said that he asked C.K. whether it would still be accurate to retain the remaining language in Paragraph 2. According to Hu, C.K. said yes, even though retaining the remaining language in Paragraph 2 would indicate that C.K. was admitting to having sex with the CW during the period charged in the indictment, which was before the December 31, 2000, date that C.K. said his relationship with the CW began. C.K. crossed out the specific dates, initialed the portion he crossed out, and signed the declaration.

The Circuit Court subsequently ruled that it "did not find Edward Hu to be a credible witness."

3.

Mother testified that in the summer of 2002, she and Stepfather returned home in the evening and found C.K. and the CW "laying on the floor in the living room." She stated that the CW was completely nude, while C.K. only had shorts on. When Mother confronted C.K., he informed her that the relationship had been going on for "about a year and a half." Mother later testified that C.K. had informed her that the relationship had been going on "about a year and a half, two years. I don't know exactly how long." Mother also testified that "they said the first time he kissed her was in like December, and then it wasn't till March till they actually had sex." Shortly after Mother and Stepfather discovered C.K. and the CW together, C.K. was disfellowshipped from their church congregation.

Mother said she thought she told the prosecutor's office about the sexual relationship between C.K. and the CW, but then said, "I don't remember if I [told them]." Mother asserted that all of her testimony at Dural's trial was true and none of it was incorrect.

Mother described the circumstances surrounding the declarations that she signed that had been prepared by the Innocence Project. Mother testified that there were several errors in the first November 8, 2008, declaration that she signed. Paragraph 3 read: "I know the identity of the man, 'C.K.' who was actually sexually involved with my daughter, [the CW], the complaining witness in Cr. No. 02-1-2791, during the time Roynes Dural is alleged to have committed the sexual assaults." Mother stated that the time frame during which C.K. was sexually involved with the CW and the time frame during which Dural was sexually involved with the CW were different, although Mother thought these time frames were overlapping. Mother also stated that C.K. and the CW said their sexual relationship began after 1998 to 2000 -- the dates alleged in the indictment -- and that Mother was unsure of what time period Paragraph 3 referenced.

15

Paragraph 4 of Mother's declaration read: "The man who was sexually involved with [the CW] during the relevant time period is not Roynes Dural." Mother testified that Paragraph 4 was "not worded right[.]" Specifically, Mother stated that she did not mean to state that the CW was having sex with C.K. and not with Dural, but rather, she believed that the CW was having sex with both C.K. and Dural. ("It wasn't an either/or kind of a situation."). Mother testified that she believed that both Dural and C.K. had sex with the CW and that the periods of these sexual relationships overlapped.

Paragraph 5 of Mother's declaration read: "I know 'C.K.' is the man who committed the offenses for which Roynes Dural is convicted because I personally witnessed it, first hand." Mother acknowledged that Paragraph 5 was incorrect because she had only personally witnessed the CW and C.K. together in a state of undress in the summer of 2002, not during the period charged in the indictment. Mother also stated that she never saw C.K. and the CW having sex, and that she only knew about their sexual relationship because C.K. admitted to it after the 2002 incident. Mother repeated that she believed that both Dural and C.K. "had access" to the CW "at overlapping periods of time."

Paragraph 8 of Mother's declaration stated that: "My prior accusation of sexual assault against Roynes Dural made first on August 3, 2000, and as testified to during the pretrial proceedings and trial was false." This statement refers to Mother's allegation, which she reported to the police on August 3, 2000, that Dural had sexually assaulted Mother. Mother testified that Paragraph 8 was incorrect and that Dural did sexually assault her. Mother stated that she told the attorneys that her accusation that Dural had sexually assaulted her was true.

Although Mother asserted that there were inaccuracies in her November 8, 2008, declaration, she testified that she signed it anyway because "they said they would take care of it."

16

The second declaration Mother signed was very similar to the first declaration, except the second declaration contained C.K.'s full name rather than his initials and added a paragraph stating that Mother had never seen "any inappropriate behavior from Roynes Dural toward my daughter." Mother testified that the second declaration had been pre-written, the changes she requested from her first declaration had not been made, and the second declaration contained the same inaccuracies as the first declaration. Nevertheless, Mother admitted that she signed the second declaration.

4.

Stepfather testified that he first noticed something between the CW and C.K. when he observed the CW resting her head in C.K.'s lap in late 2000. Then, one evening at the end of July 2002, Stepfather and Mother returned home and discovered the CW and C.K. together. Stepfather stated that the CW was nude, and C.K. was only wearing "a pair of shorts[.]" Stepfather stated that C.K. approached him about a week later to discuss the incident. During their discussion, C.K. admitted that he had been carrying on a romantic and sexual relationship with the CW for "about two years[.]"

Stepfather stated that he never told the prosecution or its investigators about C.K. having a sexual relationship with the CW. Stepfather stated that he testified truthfully at Dural's trial and that he had witnessed the conduct (Dural and the CW sleeping cuddled together on the couch) that he testified to at trial.

Stepfather testified that there were a number of inaccuracies in his declaration. The declaration stated that Stepfather walked in on C.K. and the CW in "early 2002 approximately January[.]" Stepfather acknowledged at the hearing that he had actually walked in on them in about July 2002. He was sure of the July date because this incident occurred a week or two before C.K. was disfellowshipped from the congregation in August 2002. (C.K. was disfellowshipped on August 15, 2002).

Stepfather's declaration also stated that "[C.K.] and [the CW] admitted that they had been sexually involved since [the CW] was appropriately 12 years of age." However, in July of 2002, the CW was fifteen years old, and in July of 2000, the CW was thirteen years old. Stepfather acknowledged that the statement in his declaration that "[C.K.] and [the CW] admitted that they had been sexually involved since [the CW] was appropriately 12" was not correct.

Stepfather clarified Paragraph 4 of his declaration, which stated: "I know the identity of the man, [C.K.], who was actually sexually involved with [the CW] when she was underage and during the time Roynes Dural is alleged to have committed sexual assaults against [the CW]." Stepfather testified that his statement did not mean that he believed that only C.K., and not Dural, had engaged in a sexual relationship with the CW. Rather, it only meant that in hindsight, he was aware that the sexual relationship between the CW and C.K. was ongoing on or around the period of time Dural was charged in the indictment. Stepfather testified that he did not prepare his declaration and that it was written before anyone had talked to him about its contents.

5.

The CW testified and explained the circumstances leading to her disclosure to Mother of her sexual relationship with Dural:

> I skipped my period and [Mother] had asked me if anything had happened, and I told her no. . . . And then I felt bad lying to her about it because she kept asking me, so I finally told her that something . . . . did happen. I was afraid to mention who it was, so she went through a list of names. . . . And when she said Dural's name, then I said yes, that it was him.

When asked specifically whether she was in a sexual relationship with C.K. at the time she disclosed her sexual relationship with Dural to Mother in July 2001, the CW repeatedly said no. The CW testified that she began having sex with C.K.

18

after her sexual encounters with Dural had ended,[3] and there was no overlap between the time during which she had sex with C.K. and the time during which she had sex with Dural:

Q    But at the time that this event [(the CW's disclosure to Mother of the CW's sexual relationship with Dural)] had happened, you were already in a sexual relationship with [C.K.]; is that correct?

A    No. When she had asked me?

Q    Correct.

A    The very first time she had asked me if anything had happened?

Q    When you had missed your period.

A    Was I with [C.K.]?

Q    Yes.

A    No.

Q    You were not with [C.K.] at that time?

A    No.

. . . .

Q    During the time that there was a sexual relationship going on between you and Roynes Dural, okay, during that time, did you have sex with [C.K.] at all during that time?

A    No.

. . . .

Q    Okay. Before we go into the dates, without the dates, okay, during the time that you had had sex with Roynes Dural, were you having sex with [C.K.] during that same time frame?

A    No.

Q    Okay. Did you have sex with [C.K.] before that time frame that you had sex with Roynes Dural?

A    No.

Q    Did you have sex with [C.K.] after the time frame that you had sex with Roynes Dural?

A    Yes.

_____

[3] At Dural's trial, the CW testified that she last had sex with Dural within about a month before she reported her sexual relationship with Dural to Mother on July 13, 2001.

Q       Okay.  And so just so that we're clear, so there was no overlap between the two?

A       No.

However, the CW also testified that the first time she kissed C.K. was during a housewarming party for a family after the construction of their house was completed, which C.K. had testified occurred on December 31, 2000.  When asked how long after this first kiss did she have sex with C.K., the CW replied "I would say a couple months."  Also, when again pressed by Dural's counsel about whether she was in a sexual relationship with C.K. when she reported the allegations against Dural to the police, the CW replied that she did not know:

Q       Now, you had told your mother about this -- having a relationship with Roynes Dural, you told your mom about that in July of 2001; is that correct?

A       I'm not sure.

Q       July 13th of 2001?  Do you remember that?

A       No.

Q       It was reported to police on July 14th of 2001; correct?

A       I don't know.

Q       You don't remember that?

A       No.  I don't know when.

Q       But at the time it was reported to the police, July 14th of 2001, you had already had a relationship with [C.K.], is that correct, a sexual relationship?

A       I don't know.

Q       Because that sexual relationship began in 2000 -- at least 2000; is that correct?

A       I don't know.  I guess.

Q       You guess?

A       I don't know.

Q       But you said around ninth grade; is that correct?

A       Yeah.

Q       All right.  So at the time that this -- you reported -- just think about back to that time, the time that you reported this allegation of sexual assault.

> You were already in a relationship with [C.K.] at that point, isn't that correct?
>
> A     Can you repeat that. I'm sorry.
>
> Q     Yes. At the time that you went to the police to report the sexual assault, you were already in a relationship with [C.K.] at that time; is that correct?
>
> A     I don't know.

Then, when asked whether she was in a "relationship" with C.K. (without specifying whether it was a sexual relationship) when she went to the police, the CW said "yes."

The CW acknowledged that prior to Dural's trial, she did not tell police officers or the prosecution about her relationship with C.K.

C.

The evidentiary hearings on Dural's Second Rule 40 Petition were completed on June 28, 2011. The parties were given time to prepare closing arguments and proposed findings of fact and conclusions of law. In the meantime, Dural had a parole hearing before the Hawai'i Paroling Authority on October 5, 2011. The Paroling Authority granted Dural parole and he was released from custody on December 1, 2011.

In support of Dural's request for parole, Dural's attorneys had submitted a letter from Mother dated August 20, 2011. In the letter, Mother maintained that Dural was "wrongful[ly] incarcerated" and stated that:

> I had been lied to and lead to believe that Dural was responsible for a sexual relationship with [the CW]. However I now know for a fact, no doubts whatsoever that Roynes Joseph Dural is innocent of all said claims and charges. [The CW] has admitted that it was NOT Dural but [C.K.] that she was having a sexual relationship with. [C.K.] is the person responsible for the sexual crimes against [the CW]. [C.K.] is the one who should be incarcerated and should NOT be working at an elementary school. [C.K.] has admitted to me that he had a sexual relationship with [the CW] while she was a minor and that he told her not to tell anyone. He also admitted to me that they had been having sex for about a year and a half before they got caught. The evidence speaks for itself.

Dural's attorneys also took a sworn deposition of Mother on September 21, 2011. In this deposition, Mother

21

explained that she had been "confused as to the timelines" about certain events during hearings on the Second Rule 40 Petition and that the facts and circumstances surrounding these events had since become clearer. Mother stated that when the discussion in July 2001 about whom the CW was having sex with took place, the CW did not actually name Dural. Mother said that when the CW disclosed she was not a virgin, Mother began to list off names. Mother asked whether it was Stepfather, and the CW responded "no." Mother then asked whether it was Dural, to which the CW did not respond and "got quiet." Mother asked again, and when the CW did not respond, Mother "took [the CW's] silence as a confirmation[.]" Mother stated that the CW never affirmatively told Mother that Dural had sex with the CW. Mother did not ask the CW about C.K. because Mother did not consider him to be a possibility.

In her deposition, Mother discussed discovering the CW and C.K. together in August of 2002. Mother said she spoke to C.K. the next day and C.K. disclosed that the relationship had "been going on for about a year and a half to two years." Mother stated that the CW said the same thing. Mother stated that this meant the sexual relationship between the CW and C.K. would have begun while the CW was still thirteen years old.[4] C.K. also told Mother that "he told [the CW] not to say anything" about their relationship. Mother stated that she submitted the letter to the Paroling Authority because she believed that C.K. had sex with the CW while she was thirteen, and Dural did not.

Mother stated in her deposition that she believed she told the prosecuting attorney handling Dural's case about C.K.'s sexual relationship with the CW prior to Dural's trial.

Dural moved to supplement the record or reopen the HRPP Rule 40 proceedings with Mother's letter to the Paroling Authority and her deposition. Dural later moved to supplement

_____

[4] The CW's birthday was in late November 1986, so she would have been thirteen two years before August 2002, but fourteen one and half years before August 2002.

the record or reopen the proceedings with another statement by Stepfather dated March 21, 2013. Stepfather's March 21, 2013, statement included the following:

> During the trial my ex-wife at the time [Mother] and I testified that [the CW] was not sexually involved with anyone other than Mr. Dural. This testimony was misleading and inaccurate due to preparation by the [deputy] prosecuting attorney [(DPA)] . . . . A question of [the CW's] relationship history was asked, whether or not she had a prior partners [sic] or was Mr. Dural the only one. We knew of her relationship with [C.K.] before the trial but was told by [the DPA] that because the relationship between [the CW] and [C.K.] was after the said relationship with Mr. Dural that this information wasn't necessary to be brought up and to bring it up wouldn't help the case, so it was best to leave that information out. So when I testified and was asked if [the CW] had any other relationships I said no. The reason given to me by [the DPA] was not to think if she "ever" had other relationships but to only consider what was happening "at the time" of the original charges. This was misleading now that time and other critical information has been brought forward.

(Format altered; internal correction markings omitted). This statement appears inconsistent with Stepfather's testimony at the Rule 40 hearing that he did not tell the prosecution about C.K. having a sexual relationship with the CW.

The Circuit Court held a hearing on Dural's motion to supplement the record or reopen the proceedings on March 25, 2013. During the hearing, the Circuit Court noted that extensive testimony had been presented during the evidentiary hearings on the Second Rule 40 Petition; the parties had a full opportunity examine the witnesses, including Mother and Stepfather; and it was unclear from the proffered statements exactly what, if any, new evidence was truly being offered. Based on these considerations, the Circuit Court denied Dural's motion to supplement the record or reopen the proceedings.

D.

On August 29, 2013, the Circuit Court issued its Order Denying Second Rule 40 Petition. In its Order, the Circuit found:

> 18. Based upon its observations of the witness and his testimony, and upon the totality of the evidence, the Court did not find Edward Hu to be a credible witness.

19. [The CW] was not dating [C.K.] before or during the time period stated in the indictment. [The CW] was not having sexual relations with [C.K.] before or during the time period stated in the indictment.

The Circuit Court also made the following conclusions of law:

2. The declarations of [Mother] and [C.K.] and the website statements of [the CW] are not material to the issues at trial and hence are not of such a nature as would probably change the result in a later trial. See State v. McNulty, 60 Haw. 259, 267-68 (1978).

3. The Court is not reasonably satisfied that the testimony at trial of [the CW] and [Mother] was false. See State v. Teves, 5 Haw. App. 90, 97 (1984).

4. Pursuant to H.R.P.P. Rule 40, the petition is patently frivolous, the issues have been previously raised and ruled upon, or the issues raised have been waived, and Petitioner has not shown the existence of extraordinary circumstances that justify his failure to raise the issues.

5. Moreover, the allegations and arguments contained in the petition have no merit.

Accordingly, the Circuit Court denied Dural's Second Rule 40 Petition.

DISCUSSION

I.

On appeal, Dural argues that the Circuit Court erred in denying his Second Rule 40 Petition, which was based on newly discovered evidence of the previously undisclosed relationship between the CW and C.K.. As explained below, we conclude that the Circuit Court erred in denying Dural's request for a new trial based on this newly discovered evidence.

We review the denial of a motion for a new trial under the abuse of discretion standard. State v. McNulty, 60 Haw. 259, 268, 588 P.2d 438, 445 (1978). HRPP Rule 40 authorizes a defendant to seek post-conviction relief on the ground "that there is newly discovered evidence[.]" HRPP Rule 40(a)(1)(iv). In order for a new trial to be granted based on newly discovered evidence, the defendant must show that

(1) the evidence has been discovered after trial; (2) such evidence could not have been discovered before or at trial through the exercise of due diligence; (3) the evidence is material to the issues and not cumulative or offered solely for purposes of impeachment; and (4) the evidence is of such

24

a nature as would probably change the result of a later trial.

McNulty, 60 Haw. at 267-68, 588 P.2d at 445.

The first two requirements have been met. The proffered evidence was discovered after trial. The sources of the new evidence were either prosecution witnesses at trial (the CW, Mother, and Stepfather) or unknown to the defense (C.K.). They were not accessible to the defense before or at trial, and thus the failure to discover the evidence before or at trial was not attributable to the lack of due diligence by the defense.[5]

We do not read the third requirement as establishing a blanket prohibition against the grant of a new trial based on impeachment evidence.[6] Obviously there are situations where newly discovered evidence offered solely for impeachment can establish that the defendant was improperly convicted and that a miscarriage of justice has occurred. For example, if a defendant was convicted based on the uncorroborated testimony of a single witness and newly discovered evidence showed that the witness was utterly unworthy of belief because he or she had lied consistently in a series of prior cases, it would be unjust and illogical to preclude a new trial because the new evidence was solely offered for impeachment. See United States v. Taglia, 922 F.2d 413, 415 (7th Cir. 1991).

Accordingly, courts have recognized that while ordinarily a new trial will not be granted based on newly discovered impeachment evidence, there may be impeachment

---

[5] The supreme court denied certiorari on Dural's First Rule 40 Petition without prejudice to his filing another Rule 40 petition based on evidence referred to in the application for certiorari. Dural did not waive his newly discovered evidence claim by failing to raise it in his First Rule 40 Petition.

[6] In McNulty, the supreme court upheld the trial court's denial of McNulty's new trial motion on the grounds that: (1) the proffered evidence was not newly discovered because it was known by McNulty's trial counsel before trial; and (2) McNulty had not demonstrated that due diligence had been exercised prior to the conclusion of trial to procure any evidence not known by his trial counsel. McNulty, 60 Haw. at 267-68, 588 P.2d at 445. The decision in McNulty turned on the first two requirements for a new trial based on newly discovered evidence. McNulty did not address or apply the third requirement.

evidence that is "sufficiently important to the determination of guilt or innocence that it could change the result on retrial." People v. Grissom, 821 N.W.2d 50, 60 (Mich. 2012). Thus, the general practice of denying new trials based on newly discovered impeachment evidence "should not be taken to imply a rule that even if the defendant proves that his conviction almost certainly rests on a lie, the [trial] judge is helpless to grant a new trial." Taglia, 922 F.2d at 415.

In determining whether newly discovered impeachment evidence is sufficient to warrant a new trial, courts have focused on whether the defendant has established an exculpatory connection between the impeachment evidence and the offense or whether the impeachment evidence undermines critical inculpatory evidence. See Grissom, 821 N.W.2d at 60.

Here, while the proffered impeachment evidence does not prove that the CW testified falsely at trial, it was critical evidence that the defense could have used to strongly attack the CW's credibility. The prosecution's case against Dural depended almost entirely on the CW's testimony and the jury's belief in her credibility. The CW was the only witness who could provide direct evidence of the charged sexual assaults. No one else witnessed the CW's alleged sexual encounters with Dural.

In its Order Denying Second Rule 40 Petition, the Circuit Court did not address the crucial question of whether the CW and C.K. were involved in a sexual relationship on July 13, 2001, when the CW reported her alleged sexual relationship with Dural to Mother. The CW's involvement in a sexual relationship with C.K. on July 13, 2001, would provide a clear reason and motive for the CW to falsely accuse Dural and thereby protect C.K. and conceal their relationship. The Circuit Court found that the CW was not dating or having a sexual relationship with C.K. before or during the period stated in the indictment, which charged a period from November 1998 to November 27, 2000. However, this finding does not address the relationship between the CW and C.K. on July 13, 2001, the crucial date for evaluating

whether the CW had an interest in and motive for falsely accusing Dural.

The newly discovered evidence shows that the CW was in a romantic relationship with C.K. on July 13, 2001, when she reported her alleged sexual relationship with Dural to Mother. The CW concealed her relationship with C.K., who was over ten years older than the CW. The CW did not tell her family, the police, or the prosecution about this relationship. Mother and Stepfather only discovered the CW's relationship with C.K. when they unexpectedly walked in on the CW and C.K. in July or August 2002. At that time, C.K. disclosed that they had been engaged in a sexual relationship for some time, up to about two years according to Mother and Stepfather. If C.K.'s sexual relationship with the CW had begun before late November 2000 (the CW's fourteenth birthday), C.K. could have been prosecuted for first-degree sexual assault on July 13, 2001, when the CW reported her alleged sexual relationship with Dural to Mother. And regardless of whether the CW's sexual relationship with C.K. began before her fourteenth birthday, the CW plainly had a strong interest in concealing any sexual relationship with C.K. from Mother on July 13, 2001. Dural presented evidence that the CW had been in a sexual relationship with C.K. before July 13, 2001. This included the CW's testimony that she first had sex with C.K. "a couple months" after their first kiss on December 31, 2000; Mother's testimony that C.K. and the CW said they had sex in March following their first kiss; and Mother and Stepfather's testimony that C.K. admitted having been involved in a sexual relationship with the CW up to about two years before Mother and Stepfather found them together in July or August of 2002. Dural also presented undisputed evidence that the CW and C.K. were, at minimum, involved a romantic relationship before July 13, 2001, which the CW would have had an interest in concealing from Mother.

Accordingly, Dural presented newly discovered evidence that the CW had a clear motive for and interest in making a false

accusation against Dural to conceal her relationship with C.K. Such evidence, which was not disclosed or made available to the defense prior to or during Dural's trial, was necessary to provide Dural with a fair trial. Without the newly discovered evidence, Dural was not able to present a coherent theory or plausible explanation of why the CW, his niece by marriage with whom he ostensibly had a good relationship, would falsely accuse him of sexual assault. However, with the newly discovered evidence, Dural would have a cogent basis for attacking the CW's credibility and demonstrating a motive for lying.[1]

For these reasons, we conclude that the impeaching nature of the proffered evidence does not prevent it from satisfying the third requirement. We also conclude that because the case against Dural is so heavily dependent on the CW's credibility, and given the cogent basis for impeachment provided by the newly discovered evidence, the Circuit Court abused its discretion in concluding that the fourth requirement -- the evidence is of such a nature as would probably change the result of a later trial -- had not been satisfied.

II.

In light of our decision that the Circuit Court erred in denying Dural's request for a new trial based on newly discovered evidence, we need not address the other arguments raised by Dural on appeal.

---

[1] We also note that the age of consent for sexual activity in Hawai'i was raised from fourteen years old to sixteen years old effective July 10, 2001. 2001 Haw. Sess. Laws, Second Special Session, Act 1, at 941-43. On that date, it became a crime for a person to engage in sexual penetration, or engage in or cause sexual contact, with a minor who is at least fourteen but less than sixteen years old, if the perpetrator is at least five years older than the minor and is not legally married to the minor. Id. Therefore while the age of consent was fourteen during the period alleged in the indictment against Dural, it became sixteen on July 10, 2001, three days before the CW reported her alleged sexual relationship with Dural to Mother on July 13, 2001. The CW did not turn sixteen years old until November 2002. Even if C.K. had not been involved in a sexual relationship with the CW before July 13, 2001, C.K.'s undisputed sexual relationship with the CW before she turned sixteen could have been used at trial to challenge the CW's interest and motives regarding actions she took after July 13, 2001, as attempts to protect C.K. or conceal their relationship.

## CONCLUSION

We vacate the Order Denying Second Rule 40 Petition, and we remand the case for further proceedings consistent with this Memorandum Opinion.

DATED: Honolulu, Hawaiʻi, February 27, 2018.

On the briefs:

William A. Harrison
Brook Hart
Virginia E. Hench
The Hawaiʻi Innocence Project
The William S. Richardson School
    of Law
The University of Hawaiʻi at Mānoa
for Petitioner-Appellant

Stephen K. Tsushima
Deputy Prosecuting Attorney
City and County of Honolulu
for Respondent-Appellee

Chief Judge

Associate Judge

Associate Judge

29